IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CRAIG STEVEN HOWARD,

        Petitioner,

v.                                  CIV 04-1415 MCA/KBM

ROBERT ULIBARRI, Warden, et al.

        Respondents.

# PROPOSED FINDINGS
# AND
# RECOMMENDED DISPOSITION

After an interlocutory appeal where the Tenth Circuit affirmed this Court's decision on timeliness, the matter is now before the Court on the merits of Craig Howard's petition for a writ of habeas corpus under 28 U.S.C. § 2254. *See Doc. 1; see also Howard v. Ulibarri,* 457 F.3d 1146 (10th Cir. 2006). Because he filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), its standards apply to this case. *E.g., Michael Williams v. Taylor,* 529 U.S. 420, 429 (2000); *Lindh v. Murphy,* 521 U.S. 320, 326-327 (1997).

The petition contains three multi-part and overlapping claims. Claim 1 is

labeled "motion to dismiss indictment," Claim 2 is labeled "violation of the right to the effective assistance of counsel," and Claim 3 is labeled "prosecutorial misconduct." *Doc. 1* at 6, 7, 9. The nine-page, unnumbered and handwritten document that is the first attachment to the § 2254 petition details Howard's grounds for each of these claims. The last page of this document ends with a colon, but I do not interpret that to signify other similar pages are missing. *See id.* (attachments).[1]

Respondents move to dismiss the petition on procedural and substantive grounds. *See Docs. 17, 18, 36-38.*[2] All of the issues can be resolved on the federal record, which has been supplemented with state court documents and tapes.[3] Therefore, an evidentiary hearing is unnecessary. *E.g., Trice v. Ward,* 196 F.3d 1151, 1159 (10th Cir. 1999), *cert. denied,* 531 U.S. 835 (2000); Rule 8(a), Rules Governing Section 2254 Cases in the United States District Courts. I recommend that the § 2254 petition be dismissed on the merits, and that any unexhausted

---

[1] Numerous other attachments also follow the nine-page attachment but these "exhibits" are mainly copies of state court documents and do not elaborate on the federal claims.

[2] Each of Respondents' grounds for dismissal was before the Court in Document 36, which incorporated Documents 17 and 18, but because CM/ECF required pending "motions" to file this recommendation, the Court requested Respondents to file Documents 38 and 39.

[3] Part of the state record consists of many tapes of proceedings, but not all of them are pertinent to the issues before me. However, all of the relevant tapes have been carefully reviewed.

claims also be found procedurally defaulted.

# I.  Background

A woman's purse containing her checkbook and credit card was stolen from a conference room at Mesilla Valley Hospital in Las Cruces.  Although the victim quickly notified her bank and credit card company of the theft, the checks and card had been used at the Mesilla Valley Mall.  A couple's checkbook also was stolen from an office located between the hospital and mall,[4] and those checks were used to make purchases at the mall too.

Howard's girlfriend, Lequita Demyers, was the person who used the stolen checks and credit card to make not only the purchases at issue in his trial, but many more.  Howard did not deny that he was present or nearby when some of the purchases were made, or that some of the merchandise was purchased for him.  The prosecution's case therefore, would turn on whether Howard knew his girlfriend was using stolen items to pay for the purchases.  *See, e.g., Record Prope*r at 126C, 130-40, 154-60, 192-98, 229-38; *Doc. 10,* Exh. H at 1-8; *id.,* Exh. I at 1-8; *Tape Log*

---

[4] I note that the hospital, mall, and bank building where the office was located are on the same street and only a few blocks from one another. *See, e.g., Citizens for Peace in Space v. City of Colorado Springs,* ___ F.3d ___, 2007 WL 603049 at *3 & n.2 (10th Cir. 2007) (judicial notice that a protest was "several blocks" from a conference center; and in footnote citing cases where courts have taken judicial notice of distances).

*11/25/98 Jury Trial* at 13-15; *Tape Log 8/9/99 Jury Trial* at 18-20.[5]

Following a mistrial, a second jury convicted Petitioner of four of seven charges for fraudulent use of a credit card, forgery, and conspiracy to commit the same. Howard admitted that he was a habitual offender and is now serving a sixteen-year sentence imposed by then state district judge Lourdes A. Martínez.[6] This Court's prior entries and the Tenth Circuit's opinion set forth the procedural background in more detail, and I incorporate them herein by reference. *See Docs. 12, 22; see also Howard,* 457 F.3d at 1147.

## II.  Procedural Default

After the conclusion of the direct appeal of his conviction, Howard pursued state habeas relief *pro se* while his attorneys pursued serial motions to reduce his sentence. He filed his first two state habeas petitions while the denial of the first motion to reconsider sentence was on direct appeal. *See Exhs. Q-EE.* Judge Martínez denied these state petitions finding that "the Court no longer has jurisdiction to consider" them because the notice of appeal had divested the district

---

[5] Unless otherwise noted, all citations to Exhibits are those attached to Respondents' Answer, *see Doc. 10,* and all citations to the Record Proper are to the Bates-stamped pages.

[6] Judge Martínez is now a United States Magistrate Judge of this district, having taken the federal bench on April 1, 2003.

court of jurisdiction.  *See Exhs. W, Y.*

After the appeal concluded and the district court denied counsel's second motion to reconsider sentence, Howard filed his third *pro se* state habeas petition. *See Exhs. FF-II.*  At this point the case was assigned to the late District Judge Silvia Cano-Garcia.  She found that she had jurisdiction over the third habeas petition, denied it,[7] and the New Mexico Supreme Court denied certiorari.  *See Exhs. JJ-MM.*

A state court can enforce a state procedural rule and reject a claim on that basis.  If that state default rule constitutes an "independent and adequate" procedural ground, a federal habeas court cannot entertain the defaulted issue unless the petitioner demonstrates either "cause and prejudice" or a "fundamental miscarriage of justice."  In addition, federal habeas relief cannot be granted unless a federal petitioner has exhausted all state court remedies that are still available at the time the federal petition is filed.  Depending on state law requirements then, an unexhausted claim at the time of federal filing can become procedurally defaulted

---

[7] District Judge Steven Bridgeforth actually signed the order denying the third state habeas petition.  However, Judge Cano-Garcia's name appears as the judge of record on the first page and on the signature line.  *See Exh. KK.*  Therefore, throughout this recommendation, I will refer to the decision as Judge Cano-Garcia's.

due to the length of time it takes the federal court to address the petition.[8]

In separate motions and for separate but related reasons, Respondents move to dismiss all of the federal claims as procedurally-defaulted. *See Docs. 18, 36.* For the reasons below, I recommend that the § 2254 petition not be dismissed on that basis.

A.  *State Courts Must Enforce The Default For <u>Jackson</u> To Apply*

Respondents argue that all of trial counsel's alleged deficiencies were known to Petitioner and his competent appellate attorney at the time of the direct appeal of his conviction, but appellate counsel did not raise ineffectiveness at that juncture.  They assert that failure to raise ineffectiveness on direct appeal constitutes a procedural default under *Jackson v. Shanks,* 143 F.3d 1313 (10th Cir.), *cert. denied,* 525 U.S. 950 (1998).  *See Doc. 36* at 2-3.  I disagree.

For a federal court to enforce a procedural default of this sort, the state courts themselves must have enforced it.  That was the situation in *Jackson,*[9] and is

---

[8]  *E.g., Baldwin v. Reese,* 541 U.S. 27, 29 (2004); *O'Sullivan v. Boerckel,* 526 U.S. 838, 848 (1999); *Gray v. Netherland,* 518 U.S. 152, 161-162 (1996); *Harris v. Reed,* 489 U.S. 255, 263 (1989); *Coleman v. Thompson,* 501 U.S. 722, 735 (1991); *Ylst v. Nunnemaker,* 501 U.S. 797, 803-804 (1991); *Thornburg v. Mullin,* 422 F.3d 1113, 1141 (10th Cir. 2005); *Murphy v. McKune,* 139 Fed. Appx. 114, 116 (10th Cir. 2005).

[9]  *See Jackson,* 143 F.3d at 1318 (state court impliedly dismissed second state habeas petition for failing to raise issues on direct appeal); *id.* at 1319 (state court did not deny second state habeas petition on ground he failed to raise the issues in the first state petition and Tenth Circuit is "not inclined to rely on a state procedural rule that the New Mexico courts did not rely

a requirement that has long been imposed by the Supreme Court,[10] the Tenth

Circuit,[11] and the presiding judge as well.[12]  No state decision enforced a "failure to

raise ineffectiveness on direct appeal" rule in denying Howard's state habeas

petitions or review thereof.  *See Exhs. W, Y, KK, MM.*[13]  Therefore, I recommend

rejecting this basis for finding a procedural default.

### B.  <u>Watson</u> Is Inapposite When Claims<br>Are Entertained In Subsequent Proceedings

Respondents also contend that Howard's ineffectiveness claims should be

---

upon.").

[10]  *E.g., Ylst,* 501 U.S. at 903-04; *Harris,* 489 U.S. at 262 & n.10.

[11]  *E.g., Cannon v. Mullin,* 383 F.3d 1152, 1172 (10th Cir. 2004) ("A procedural ground is 'independent' if it is based on state, rather than federal, law. . . .  That is indisputably the case here, where the OCCA refused to hear Mr. Cannon's ineffective-assistance claims because they had not been raised on direct appeal, as required by Oklahoma law."), *cert. denied,* 544 U.S. 928 (2005).

[12]  *E.g., LaVoy v. Snedeker,* 2004 WL 3777537 at *2 (D.N.M. 2004) ("For a state procedural rule to constitute an 'independent' ground . . . the state courts must enforce the default.  As such, a federal habeas court cannot decline to address a claim if the state court did not 'clearly and expressly' base its decision on the procedural ground."); *see also, e.g., id.* n.5 (cases cited therein).

[13]  I note that it is not settled whether any such rule in New Mexico would have been deemed "adequate" for federal habeas purposes.  *See, e.g., Thornburg v. Mullin,* 422 F.3d 1113, 1141 (10th Cir. 2005) ("We have had several occasions to express concern about whether Oklahoma's procedural bar is 'adequate and independent,' particularly with respect to ineffective-assistance claims, *see, e.g., Cannon* . . . but Mr. Thornburg . . . does not challenge independence and adequacy here.").

dismissed under *Watson v. State of New Mexico*, 45 F.3d 385 (10th Cir. 1995) for failure to raise them on direct appeal of his conviction.  Again, I disagree.

*Watson* is inapposite because it is an "exhaustion-created" default situation. That is, in *Watson* the claims were defaulted because they were not exhausted to the New Mexico Supreme Court when the federal petition was filed, and the time to do so had expired by the time this Court reviewed the federal petition.  45 F.3d at 386-87.  Under those circumstances, the petitioner's bypass of available avenues of relief deprived the state courts of the opportunity to hear the federal claims. And, because any then-existing state avenues were no longer available, the federal court could not require exhaustion and give the state courts the first chance to hear the claims.  For comity reasons, therefore, federal habeas courts may enforce a "default" in those circumstances, even though there is no state court decision that enforced it.

Here, in contrast, while Howard did not appeal the denial of his first two state petitions for lack of jurisdiction, he also *did not* file his federal petition at that time.  Rather, he resurrected his claims in the third state petition, and Judge Cano-Garcia considered them.  *Compare Gray*, 518 U.S. at 161-62 (petitioner failed to bring claim in state court on direct appeal or post-conviction, and state rules would not permit second post-conviction proceeding under the circumstances; therefore

8

Supreme Court enforced default of the unexhausted claim).  Thus, I recommend that this argument be rejected.

### C.  Judge Cano-Garcia Did Not Enforce A Procedural Default Under <u>Sisneros</u>

As best I can tell, Respondents also argue that, in denying habeas relief based on *State v. Sisneros,* 79 N.M. 600, 446 P.2d. 875 (N.M. 1968), Judge Cano-Garcia expressly enforced the "rule" that Howard was required to seek Supreme Court review after Judge Martínez dismissed his first two petitions.  *See Doc. 36* at 3-4.  I do not read the decisions that way.

The *Sisneros* decision holds that "issues . . . *resolved against defendant in an evidentiary hearing on the merits* [in a prior habeas proceeding are] not entitled to a successive determination on the merits."  79 N.M. at ___, 446 P.2d. at 879-80 (emphasis added).  I read *Sisneros* as a rule against reconsideration of claims already adjudicated on the merits.  Judge Cano-Garcia evidently interpreted the decision the same way – as a merits-based rule – because she expressly declined to consider claims Judge Martínez had "already considered and rejected."  *Exh. KK* a ¶¶ 4-5.[14] However, she misinterpreted Judge Martínez' dismissal, which was not based on the

---

[14]  If Judge Cano-Garcia had wanted to enforce a different rule – that is, claims that could have been raised in a first petition will not be permitted in a second petition – then she would have cited *State v. Gillihan,* 86 N.M. 439, 440, 524 P.2d 1335, 1336 (1974).  She did not.

merits and certainly not after an evidentiary hearing.  Rather,  Judge Martínez

dismissed on jurisdictional grounds and did not specify that the dismissal was with

prejudice.

Contrary to Respondents' argument, *Sisneros* does not stand for the

proposition that review of a subsequent state habeas petition is precluded if the

defendant fails to petition the New Mexico Supreme Court for certiorari from

denial of a first petition.  It certainly does not stand for the proposition that failure

to petition for certiorari constitutes a default when the dismissal of the first petition

is for lack of jurisdiction and the state court entertains the subsequent petition.

Respondents have not cited and I have not found any state rule to that effect.

Thus, I also recommend rejecting this argument.

### D.  *Judge Cano-Garcia's Treatment Of The Indictment Claim Did Not Consider The Ineffectiveness Ground*

Ground 1 of Howard's third *pro se* state habeas petition was labeled "motion

to dismiss indictment."[15]  There he asserted that the indictment could have been

dismissed because the prosecutor "clearly abused the grand jury process" by

_____

[15]  The third state habeas petition is attached as Exhibit JJ to Respondents' Answer, but it does not contain the many exhibits Howard attached to the petition.  The full version appears in the Record Proper, but I cannot provide a pin-cite to the full version because the entire Record Proper is not Bates-stamped.

presenting "perjured testimony on a material issue" and failing to "disclose" and "present" exculpatory evidence.  But, as here, he also asserted that this gave trial counsel "arguable grounds to support a motion to dismiss the grand jury indictment."  *See Exh. JJ* at 9-10.

Judge Cano-Garcia denied this claim both on a procedural ground *and* on the merits.

> The defendant claims that the Court should dismiss the indictment on various evidentiary grounds.  This claim is without merit.  Motions to quash the indictment must be raised prior to trial.  Rule 5-601 NMRA.  *See also Rogers v. State,* 94 NM 218, 608 P.2d 530 (Ct. App. 1980).  Since the jury found the defendant guilty as charged beyond a reasonable doubt, it follows that probable cause existed to charge him in the first place.

*Exh. KK* at ¶ 2.  The citations to the rule and *Rogers* case constitute the procedural default ruling, but the probable cause ruling is on the merits.  Respondents argue that invocation of the waiver rules is enforceable procedural default.  *See Doc. 18* at 2-3.  I disagree.

The procedural basis for denying the claim implicates the very ineffectiveness claim Howard raises – counsel failed to challenge the grand jury proceedings.  Under Judge Cano-Garcia's reasoning, counsel's failure amounts to a waiver.  Yet, neither her decision nor Respondents' arguments here acknowledge

11

the ineffectiveness component plainly raised by Howard's claim in the state courts and here.  Indeed, both the rule and decision she cited allow relief from waiver for "cause" but that exception to the waiver rule was not discussed at all.

Because Judge Cano-Garcia's enforcement of the "waiver" ignored the ineffectiveness aspect of the claim, I cannot find the federal claim is procedurally defaulted.  Furthermore, the prosecutorial misconduct claims that she declined to discuss under *Sisneros* are the basis for the ineffectiveness claims with regard to the grand jury.  Therefore, I recommend that this argument be rejected.

## E.  Unexhausted Ineffectiveness Claims

Respondents contend that certain ineffectiveness claims are now *Watson*-type defaults, because Howard only specified two such claims in his petition for certiorari from Judge Cano-Garcia's denial of his state petition.  *See Doc. 36* at 4; *see also Exh. LL.*

This is true.  Nevertheless, it is just as easy to address the merits of the ineffectiveness claims as it is to navigate the procedural default issues.[16]  Therefore,

---

[16]   *See Snow v. Sirmons,* ___ F.3d ___, 2007 WL 80022 (10th Cir. 2007) ("We can avoid deciding procedural bar questions where claims can readily be dismissed on the merits."); *Spears v. Mullin,* 343 F.3d 1215, 1256 (10th Cir. 2003) (state asserted claim was procedurally defaulted but "[f]or efficiency, we address the merits"), *cert. denied,* 541 U.S. 909 (2004); *Romero v. Furlong,* 215 F.3d 1107, 1111 (10th Cir.) ("case presents a number of complex issues concerning the applicability of [the] procedural bar to these claims.  We need not and do not address these issues, however, because the case may be more easily and succinctly affirmed on the merits."),

I proceed to the merits of the claims.

To the extent that the claims are without merit, however, I note that Howard necessarily fails to show "actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  *Coleman,* 501 U.S. at 750; *see also e.g., Ives v. Boone,* 101 Fed. Appx. 274, 292 (10th Cir.) ("our conclusion that Mr. Ives' double jeopardy and collateral estoppel claim is without merit leads us to conclude no miscarriage of justice will result from our decision not to excuse Mr. Ives' procedural default"), *cert. denied,* 543 U.S. 1001, 1026 (2004).  Thus, any meritless claims that are unexhausted also qualify as procedurally-defaulted.

# III.  Standards Of Review

So long as the state court does not dismiss a claim on procedural grounds,

---

*cert. denied,* 531 U.S. 982 (2000); *Watters v. Ray,* 175 Fed. Appx. 212, 215 n.1 (10th Cir. 2006) (affirming on procedural default grounds without reaching merits but noting it did not disagree with district court's treatment of the merits); *Tisthammer v. Williams,* 49 Fed. Appx. 757, 764-65 (10th Cir. 2002) ("In his petition for writ of certiorari to the New Mexico Supreme Court seeking review of the denial of his state habeas petition, Tisthammer did not raise the shackling claim. Accordingly, Tisthammer has not properly exhausted the claim. [in footnote] It is likely that the shackling issue is procedurally barred. . . . [in later text] Despite Tisthammer's failure to properly exhaust this claim in state court, this court may deny relief on the merits.  See 28 U.S.C. § 2254(b)(2)."), *cert. denied,* 538 U.S. 928 (2003); *but see Coleman,* 501 U.S. at 750 (federal review of procedurally-defaulted claims barred unless cause and prejudice or fundamental miscarriage of justice); *Harris,* 489 U.S. at 262 ("a federal claimant's procedural default precludes federal habeas review"); *Hammon v. Ward,* 466 F.3d 919, 924 (10th Cir. 2006) ("Under AEDPA, we generally may not consider "issues on habeas review that have been defaulted in state court""").

this Court applies the deferential standards of review under AEDPA even if the disposition is entirely summary.  I consider the decision before me in that posture even though Judge Cano-Garcia did not address some of the claims.  *C.f., Griffin v. Lemaster,* 179 Fed. Appx. 555, 558-59 (10th Cir.), *cert. denied,* 127 S. Ct. 687 (2006).  The Supreme Court and Tenth Circuit have discussed the AEDPA standards in detail, and I will not reiterate them here.  *E.g., Maynard v. Boone,* 468 F.3d 665, 669-71 (10th Cir. 2006) (and cases cited therein), *cert. denied,* ___ U.S. ___, 2007 WL 73653 (2007); *Stevens v. Ortiz,* 465 F.3d 1229, 1234-35 (10th Cir. 2006), *cert. denied sub nom, Zavaras v. Stevens,* ___ U.S. ___, 2007 WL 142539 (2007); *Parker v. Scott,* 394 F.3d 1302, 1308-09 (10th Cir. 2005) (same).

In addition, for all of the ineffective assistance of counsel issues, I apply the two-prong *Strickland* test.  That is, Petitioner must show that counsel's conduct was constitutionally deficient and that but for the conduct, the result of the proceeding would have been different.  Failure to make either showing defeats the claim.  *E.g., Smith v. Robbins,* 528 U.S. 259, 286, n.14 (2000); *Strickland v. Washington,* 466 U.S. 668, 687 (1984); *United States v. Orange,* 447 F.3d 792, 796-97 & n.5 (10th Cir. 2006).

Finally, I review the unexhausted and thus potentially procedurally defaulted claims *de novo,* but note that even if some of the AEDPA–review claims in fact

14

should be reviewed *de novo*,[17] for the same reasons set forth below, I would find

them without merit under either standard of review.

# IV.  Analysis

The tape logs do not necessarily reflect all of the aspects of trial that are

important to the resolution of the issues.  Thus, all nine tapes of the second trial

were carefully listened to as well as the single tape of the grand jury proceedings.

*See Tapes 1-9* (August 1999 trial); *Tape* (Grand Jury 1998).[18]  My law clerk has

transcribed portions of those tapes.

## A.  Overview of Evidence & Sufficiency Findings

The single theme underlying Petitioner's claims is that the State should not

have been permitted to pursue a theory of aiding and abetting or conspiracy liability

---

[17]  Under some circumstances, *de novo* review is appropriate.  *E.g., Rompilla v. Beard,* ___ U.S. ___, 125 S. Ct. 2456, 2467 (2005); *see also, e.g., Chrisman v. Mullins,* 2007 WL 102984 at *2 (10th Cir. 2007) ("Under the AEDPA, the appropriate standard of review for a particular claim is dictated by the treatment of that claim by the state courts.  Because Chrisman's ineffective–assistance–of–counsel claim against Henry was not decided on the merits by the state courts, and is not otherwise procedurally barred, we may exercise our independent judgment in deciding the claim.  *See LaFevers v. Gibson,* 182 F.3d 705, 711 (10th Cir. 1999)."); *Goble v. Saffle,* 188 Fed. Appx. 723, 729 (10th Cir. 2006) ("a de novo standard must be applied here.  A review of the nature and development of the issue will both demonstrate why AEDPA deference is not applicable here"), *cert. denied sub nom Goble v. Jones,* ___ U.S. ___, 2007 WL 632848 (2007).

[18]  Please note that Petitioner listened to these tapes at some point too.  In some of his submissions to the state courts and here, he attaches his own notes of the testimony and/or proceedings on these tapes.  His renditions, however, are not exact transcriptions and are interspersed with his own impressions of the veracity or legal significance of the testimony.  *See, e.g., Doc. 1* (attachments).

against him, when there was no direct evidence of his knowledge and little

circumstantial evidence to show the same.  Indeed, appellate counsel raised

numerous sufficiency of the evidence claims on direct appeal.  The New Mexico

Court of Appeals rejected each claim and found the evidence sufficient to support

the accessory and conspiracy verdicts under the *Jackson* standard.[19]

Despite the theme underlying his claims, Howard does not directly challenge

the sufficiency of the jury verdict in his federal petition.  Nor could he.  In my view,

the Court of Appeals sufficiency decision withstands scrutiny under either an

AEDPA or *de novo* standard.  The decision does so based on the evidence related

below, which the court specifically considered in making its rulings.  *See Exh. K* at

2-6 (and page 7 were it not missing).

There were three days of transactions at issue: (1) Demyers' April 1, 1998,

---

[19] *See Exh. K* at 2-9 (and cases cited therein) *see also, e.g., Exh. H* at 9 (citing *Jackson* for argument that "Due Process Clause of the state and federal constitutions" require proof beyond a reasonable doubt); *Valdez v. Bravo,* 373 F.3d 1093, 1096 n.1 (10th Cir.) (Although the New Mexico Court of Appeals did not cite to *Jackson,* the sufficiency of the evidence standard it applied was identical to the Supreme Court's formulation."), *cert. denied,* 543 U.S. 1008 (2004); *Brown v. Blair,* 135 Fed. Appx. 153, 155 (10th Cir. 2005) ("The [state] court concluded all essential elements of the crime were supported by direct or circumstantial evidence such that a rational trier of fact could conclude that each element had been proven beyond a reasonable doubt.  This too is consistent with and a reasonable application of federal law.  *See Jackson* . . ."); *Mora v. Williams,* 111 Fed. Appx. 537, 541 (10th Cir. 2004) ("The New Mexico Supreme Court relied on its own cases adopting *Jackson's* sufficiency of the evidence standard. . . . citing *New Mexico v. Sutphin,* 107 N.M. 126, 753 P.2d 1314, 1319 (1988) and *State v. Hernandez,* 115 N.M. 6, 846 P.2d 312, 332 (1993) . . .  Whether or not it cited *Jackson,* the New Mexico Supreme Court applied the proper standard."), *cert. denied,* 543 U.S. 1147 (2005).

purchase of a picture from Fifth Avenue and tennis shoes from Foot Action with the stolen credit card; (2) her April 3, 1998, purchase of clothing and sunglasses at Maurice's with a stolen check; and (3) her April 25, 1998 purchase of clothing at County Seat and bedding at J.C. Penney with stolen checks.

The prosecutor, Tom Clark, relied primarily on portions of the voluntary statement Howard made to the police as evidence of his knowledge.  There Howard indicated that he knew something was amiss but that he tried to distance himself from what was going on.  He also indicated, as had Demyers in her initial statement to the police, that the person who created the fraudulent scheme was not Demyers but her friend "Wanda."

There is no transcript or other written source of Howard's complete statements to the police in context, so I will provide them here:

> [Officer]  And at this time do you want to talk to me in reference to these checks?
> [Howard]  Yeah.
> [Officer] OK, tell me what you know about these checks.
> [Howard]  Um, basically, I was just aware of what was going on and, um, [inaudible in original], and Wanda needed a ride to go to the store and was tellin' me – uh, uh – go to Orion's and she will pay and she [background noise in original].  I told her: 'You don't understand, I ain't involved in nothin'.  I ain't – you know – I ain't – I'm not – I'm there just to give you a ride.'  You know what I'm saying?  Just [inaudible] she was telling me, you know, basically – or right, right – just then I don't want

17

to know, I don't want wanna be in your business.  See what I'm saying?

[Officer]  Right.

[Howard] So me knowing the way the law goes – you know what I'm saying? – I'm not touching nothin' – I'm not – I'm not – you know what I'm saying? –

[Officer]  You don't – you don't – wanna be directly involved.

[Howard] I do not want to be in shit.  I'm not in the shit.  You see what I'm saying?

[Officer]  Yeah.

[Howard] You know – what you do is your business – you know – leave me out of it [skipping forward in the statement]  I went with her one time.

[Officer] OK.

[Howard] I gave her a ride one time – that's it.

[Officer]  OK.

* * * * *

[Howard]  She wanted a ride and she told – she told Laquita that she was – might have to do some returns.

[Officer]  That she – you all knew this – that the purchases were made with stolen checks?

[Howard] I didn't know exactly whether there was gonna be no stolen checks.  I thought it was a friend of hers who was gonna close her [inaudible] a friend of hers – they opened an account and they were just gonna – she was just gonna write checks in her name until, uh, and then she was just gonna file bankruptcy.

[Officer]  Oh, OK.

[Howard] This is like – I – the understanding I had – it wasn't just like um, they took the checks from someone or something like that, you know.

[Officer]  Who told you that?

[Howard]  I – I – there's nobody tell me directly, I heard a conversation.

[Officer]  Between who?

[Howard]  Uh, her and some – her and Wanda and some

other, uh, friend of hers, you know was talking.

[Officer]  Was Laquita there?

[Howard]  No she wasn't.

* * * * *

[Officer] When you went to Foot Action, when you went
to Foot Action to get a pair of tennis shoes . . .

[Howard]  I didn't try . . .

[Officer]  Didn't you . . .

[Howard] shit on.  I didn't try nothing on.

[Officer]  You did not . . .

[Howard]  I didn't do shit.  I did not ask for nothin' or
nothin' like that.  So that's what I'm trying to tell you, I
did not.

[Officer]  But you were present?

[Howard]  That.

[Officer]  Even if Laquita was there doing it on her own,
were you with her?

[Howard]  I was.

[Officer]  When it happened?

[Howard]  I wasn't standing at no counter.  I was not
present at no transactions.

[Officer]  But you knew the transaction was going to take
place?

[Howard]  I didn't have no knowledge of the transaction
as far as something being wrong being taken place,
period.  I was not involved with nothin' like that.

* * * * *

[Officer] You're an adult, man, you can take care of yourself.

[Howard] Right.

[Officer] You can . . .

[Howard] I'm takin' care of myself, man.

[Officer] OK, you can walk away, whatever . . .

[Howard] I'm – I'm lookin' at – I'm – I'm taking care of myself,
man, I'm surviving.

[Officer] But you allowed this stuff to happen

[Howard] I ain't allowing nothing, they are gonna do what the
fuck they want to do.

19

[Officer] But you're right there with them every time.

[Howard] Who?  I ain't right there with nobody, man.  I ain't right there with them every time, man.  I took them – took them one – Goddam right, man.

[Officer] And you accepted money knowing that?

[Howard] I accepted for giving somebody a ride, not accepting money for no involvement in nothing like that.  That's why I accepted.  For giving a ride.  It's just like a taxicab, man.

* * * * *

[Officer] All right.  A couple questions now.  You can tell us Laquita presented the card and . . .

[Howard]  I ain't talked to her or say nothin,' but I ain't sure of nothin' because I was not standing over nobody watching her [unintelligible].

* * * * *

[Howard] That's it – I'm just telling you, so what do you think, man?  I mean, I see Wanda had signed, uh, used her credit card at the Foot Action.

[Officer] Foot Action?

[Howard] Yeah.

[Officer] Did she ask you about the tennis shoes?

[Howard] She just – she told me – she said that she wanted to get – she said she wanted to get to have [inaudible in original] uh, uh Nikes – I tell you that –  and I said 'over here' and man, that's what I did – I said 'here' and she told me what size she wanted and that's it.

* * * * *

[Howard] I'm not tied into this – this is – I mean, if you know Wanda's background.  You know.  You know.

[Officer] I know.

[Howard] You know what I'm saying – she boosts, steals, and she do all that kind of shit.

* * * * *

[Officer] Well, first of all, is Wanda hooked on anything?  Crack or. . .

[Howard] Oh, you know, well, they'll shoot crack.

20

*From Tapes 5-6* (August 1999 trial).

Defendant did not testify and the defense relied primarily on Demyers'

testimony that Howard had no idea she was using a stolen credit card or stolen

checks, and eyewitness accounts of his behavior.  The jury obviously listened

carefully to defense counsel's closing argument, because it fully acquitted Howard

of three of the seven charges.[20]  It did not convict him of the charges where he was

not present when the transaction took place, such as Maurice's or J.C. Penney.

Conversely, it did convict him as an accessory and conspirator of the crimes where

he was present in the stores and participated in some way, such as selecting the

painting, men's tennis shoes, and men's clothing.  *See, e.g., Record* at 13-14, 128-36,

154-60.

## B.  Grand Jury & Related Claims

Petitioner complains that the proceedings were irregular and should have

resulted in a dismissal of the indictment, had his attorney pursued that avenue,

because:  Officer Perea to testified about what other witnesses said by reading from

their statements in police reports; this evidence was "lies" and not sufficient to

show knowledge; the prosecutor read instructions too fast, causing a juror to

---

[20]  The attached Appendix is a transcription of defense counsel's entire closing argument.

21

comment on it; and the prosecutor read an accessory instruction rather than giving it to the jurors in writing. *See Doc. 1* (and attachments).

There are three independent reasons to reject all of the grand jury-related claims on the merits.

1. State Grand Jury Claims Are Not Cognizable In Federal Habeas

Respondents are correct that habeas relief under § 2254 can only be granted on violations of the federal constitution.[21]  In general, errors of state law are not grounds for habeas relief unless the error rendered the proceedings fundamentally unfair – in other words, in violation of federal due process. *E.g., Estelle v. McGuire*, 502 U.S. 62, 67-69 (1991); *James v. Gibson*, 211 F.3d 543, 555 (10th Cir. 2000), *cert. denied*, 531 U.S. 1128 (2001).

Recognizing that the issue is not entirely settled in the Tenth Circuit, Respondents assert that sufficiency of a grand jury indictment or irregularities in state grand jury proceedings are not cognizable in federal habeas particularly, as here, where a petit jury subsequently finds the petitioner guilty of the charges.  I

---

[21]  *See Doc. 18* at 3; *see also* 28 U.S.C. § 2254(a) (the federal courts "shall entertain an application for a writ of habeas corpus . . . only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States"); *Bodine v. Warden of Joseph Harp Correction Center*,  2007 WL 534449 at *1 (10th Cir. 2007) ("federal habeas relief . . . requires a showing that petitioner is being held 'in custody in violation of the Constitution or laws or treaties of the United States.'  *Knox v. Wyoming Dep't of Corrections*, 34 F.3d 964, 966 (10th Cir. 1994)[, *cert. denied*, 513 U.S. 1091 (1995]").

find the reasoning and decisions cited by Respondents persuasive and incorporate them herein by reference. *See Doc. 18* at 3-5.[22]

Furthermore, both the Supreme Court and the Tenth Circuit have specifically held that a grand jury indictment cannot be challenged on the basis that there was insufficient evidence to support a the indictment, one of Petitioner's assertions here. *See, e.g., United States v. Williams,* 524 U.S. 36, 50-55 (1992); *Hopkinson v. Shillinger,* 866 F.2d 1185, 1199 (10th Cir. 1989) (*overruled on other grounds, Sawyer v. Smith,* 497 U.S. 227 (1990)), *cert. denied,* 497 U.S. 1010 (1990).

2.  Even If An Independent Due Process Claim Exists, It Is Without Merit

In some decisions the Tenth Circuit has assumed, without deciding, that a constitutional challenge based on alleged perjured testimony before the grand jury

---

[22] *See also, e.g., Campiti v. Matesanz,* 186 F. Supp. 2d 29, 53 (D. Mass. 2002) ("the Supreme Court "has never held that federal concepts of a grand jury, binding on the federal courts under the Fifth Amendment, are obligatory for the States. . . .  Since he was indicted, tried, and convicted in state court, Campiti's arguments under the Grand Jury Clause of the Fifth Amendment must be rejected.") (internal quotations and citations omitted), *aff'd,* 333 F.3d 317 (1st Cir.), *cert. denied,* 540 U.S. 931 (2003); *Tesack v. Trent,* 22 F. Supp. 2d 540, 547 (S.D. W.Va. 1998) ("Accordingly, the charges that the grand jury lacked jurisdiction to return an indictment because he had filed a *pro se* habeas petition with the circuit court, that such a filing should have prevented the case from going to the grand jury, and that he was not properly indicted are not cognizable under 28 U.S.C. § 2254  and must be dismissed."); *Taylor v. Minnesota,* 2006 WL 2583150 at * 11 (D. Minn. 2006) ("Petitioner's claims of grand jury impropriety are incognizable on habeas review."); *Mariani v. Kelly,* 2001 WL 1860961 at * 5 (N.D.N.Y. 2001) ("Petitioner's contentions of improprieties in the grand jury proceedings are not cognizable for federal habeas corpus review.").

is actionable in § 2254 proceedings.[23]  Assuming for the purposes of argument that

Petitioner's grand jury claims present a federal due process claim either because of

his characterization of Officer Perea's testimony as perjured or otherwise, I agree

with Respondents that the claims are without merit, and again incorporate the

reasoning and decisions they provide.  *See Doc. 18* at 5-7.

Having listened to the entire tape of the grand jury proceedings, no factual

basis exists for challenging any aspect of the proceedings.  The prosecutor read the

proposed indictment verbatim – the same indictment that the grand jurors and

---

[23]  For example, in *Moreland v. Madrid,* 2000 WL 1594219 (10th Cir. 2000), *cert. denied,* 532 U.S. 961 (2001), a case from this District, the Tenth Circuit observed:

> Mr. Moreland rests his claim of constitutional deprivation on
> *United States v. Basurto,* 497 F.2d 781, 785-86 (9th Cir. 1974), a
> case in which the Ninth Circuit held the Due Process Clause of the
> Fifth Amendment is violated when a defendant has to stand trial
> on an indictment which the government knows is based partially
> on perjured testimony.  Although we have never explicitly adopted
> *Basurto,* we have, on two occasions, settled cases on the
> assumption it is followed in this circuit.  *See Talamante v. Romero,*
> 620 F.2d 784 (10th Cir.) ("assuming we were to follow the *Basurto*
> line of cases") [ § 2254 case challenging New Mexico conviction,
> and *cert. denied,* 449 U.S. 877 (1980)]; *Doran v. Stratton,* 930 F.2d
> 33 (10th Cir. 1991) (unpublished opinion) [ § 2254 case
> challenging New Mexico conviction] ("assuming, without
> deciding, the *Basurto* test applies").  Nonetheless, assuming *Basurto*
> is the law of this circuit, we believe Mr. Moreland fails to assert
> facts which would support a constitutional violation.

*Id.* at * 2; *see also, e.g., Jones v. Keane,* 250 F. Supp. 2d 217, 232-37 (W.D.N.Y. 2002); *Jackson v. Schriro,* 2006 WL 2038455 at * 6 (D. Ariz. 2006).

petit jurors were given during deliberation.  He then read a preliminary probable

cause instruction and the elements of the crimes, and the elements were the same

instructions given to the petit jurors.  *E.g., Tape* (1998 Grand Jury); *Record Proper*

at 13, 130-36.  The prosecutor did read those fairly fast and concluded with a

probable cause instruction that he read very, very fast.  This conversation then

ensued:

> [Prosecutor] Any – there questions before I call the
> witness?
> [Grand Juror] Can I ask you something?  You go too fast.
> Sometimes, I can't – I don't know what you're saying
> because you go too fast.  I'm sorry to tell you that but I'm
> sure some of the other people . . .
> [Prosecutor] I can sure slow down.  Is there any of that
> you'd like me to read you again?
> [Other Grand Jurors] [Laughter]
> [Grand Juror] No, no, but I mean . . .
> [Another Grand Juror] Oh, no.
> [Prosecutor] Are you sure?
> [Other Grand Jurors] [More laughter]
> [Grand Juror] Yeah, I'm sure, but the next time kinda
> take your time a little bit. . .
> [Prosecutor] Is there . . .
> [Grand Juror] . . . you know what I mean? . . .
> [Prosecutor] Was there anything . . .
> [Grand Juror] . . .  I don't know if you know what I mean.
> [Prosecutor] I – I – I start doing that when I read the
> same thing over and over, too . . .
> [Grand Juror] Oh, OK.
> [Prosecutor] . . . which I do when we have multiple
> counts of the same, but if there's any part of that you
> missed I wanna be sure you have, have, you've . . .

> [Grand Juror] I got it.
> [Prosecutor] You got it all?
> [Grand Juror] I got it but I – for next time.

*Tape* (1998 Grand Jury).  Thus, no adverse effect ensued from the way that the

prosecutor read preliminary matters to the grand jurors.

Officer Perea was the only witness presented by the prosecution to the grand

jury, and he recounted essential facts from witness statements given to the police.

But the witnesses later testified to the same information during trial.  Thus,

Howard's characterization of the testimony as "perjured" has absolutely no basis.

At the end of the officer's testimony, a grand juror wanted clarification on

whether Petitioner himself signed a check or used the credit card.  He asked the

question in two different ways.  In response to each question, the prosecutor

recalled the officer to clarify and then read an aiding and abetting instruction to

the grand jurors stating:

> I notice there is not an aiding and abetting instruction in
> here but I will give that to you verbally, anyway.  Ah, the
> instruction reads that a person may be guilty of a crime
> even though he himself does not do the acts which
> constitute the crime, if: (1) he intended the crime to be
> committed; (2) the crime was committed; and (3) he
> helped, encouraged, or caused the crime to be committed

> *[and in response to the second question]*

> Let me again give you the elements of aiding and

26

> abetting.  A person may be guilty of a crime even though
> he himself does not do the acts which constitute the
> crime, if three things occur: first, he intended the crime
> to be committed; second, the crime was committed; and
> third,  he helped, encouraged, or caused the crime to be
> committed.

*Id.*  This is the same instruction the petit jurors had.  *See Record Proper* at 138.

Nothing on the tape indicates that any grand juror needed clarification of

the oral instruction.  For example, no grand juror indicated that he or she had any

questions at that time.  The jury then deliberated off the record and thereafter

returned the indictment without asking additional questions.  *Tape* (1998 Grand

Jury).  Thus, I cannot conclude that there was any adverse effect from giving the

aiding and abetting instruction orally rather than in written form.

In addition, courts have expressed "harmlessness" as a matter of law in

different ways, but I find all are applicable here.  That is, I do not find any of the

prosecutor's conduct irregular, but even if it were, none of the asserted "errors" had

a "substantial and injurious effect" on the grand jury proceedings.[24]  Or, even if a

due process claim is cognizable in the first instance, the petit jury's subsequent

---

[24]  *See Tisthammer v. Williams*, 49 Fed. Appx. 757, 762 & n.1 (10th Cir. 2002) (New Mexico conceded constitutional right in grand jury context, and Tenth Circuit analyzed under harmless error standard rather than "structural" error for which prejudice is presumed), *cert. denied*, 528 U.S. 928 (2003).

conviction renders any grand jury errors harmless as a matter of law.[25]

### 3.   The Habeas Remedy Petitioner Seeks Is Not Available

There is a final independent reason upon which to deny the grand-jury claims.  Howard appears to be under the impression that if the grand jury failed to indict him, the state could not have pursued charges.  Howard also seems to believe that he can secure his release from prison by obtaining federal habeas relief in the form of dismissing the grand jury indictment.

As a matter of state law, however, a failure of the grand jury to indict is not the same as an acquittal.  New Mexico prosecutors are not prohibited from pursuing charges via a criminal complaint after a grand jury fails to indict.  *See State v. Issac M.,* 131 N.M. 235, 34 P.2d 624 (Ct. App.), *cert. denied,* 131 N.M. 221, 34 P.3d 610 (N.M. 2001).  Thus, the state law itself would not have provided a basis for habeas relief.

Furthermore, as a matter of federal law, an indictment will not be dismissed

---

[25]   *E.g., McDaniel v. Brown,* 2006 WL 2331105 at * 9 (D.N.J. 2006) ("Where any error in state grand jury proceeding is rendered harmless by a subsequent petit jury verdict, there is no due process deprivation."); *Hall v. Griener,* 2004 WL 350759 at * 2 (S.D.N.Y. 2004) (although "petitioner seeks to add a claim asserting irregularities in the Grand Jury, the claim is not cognizable where, as here, petitioner has been convicted by a jury after a trial.  The trial jury's guilty verdict necessarily renders any irregularity before the Grand Jury harmless."); *Lewis v. Johnson,* 1998 WL 912014 at * 3 (W.D.N.Y. 1998) ("any prejudice suffered by petitioner due to the ADA's misconduct within the Grand Jury is off-set by the petit jury's finding of guilt.").

after a conviction except in extreme and rare circumstances which are not present here.  *E.g., United States v. Yost,* 24 F.3d 99, 102 (10th Cir. 1999); *United States v. Kilpatrick,* 821 F.2d 1456, 1465 (10th Cir. 1987).  In the final analysis, habeas relief on a state conviction will not issue absent a finding of a constitutional violation sufficient to warrant such relief,[26] and these sorts of irregularities in a grand jury proceeding do not qualify.  *Goodrich v. Hall,* 448 F.3d 45, 49-50 (1st Cir. 2006).

### 4.  Conclusion

For all the above reasons, I find no merit to any of Petitioner's challenges to the grand jury proceedings.  As a result, he could not establish the prejudice prong for ineffectiveness under *Strickland.*  Thus, I do not find the state court rejection of Petitioner's claims "contrary to" or "unreasonable" under AEDPA standards, and I will recommend that the entirety of Petitioner's first and third claims, as well as portions of the ineffectiveness claim based on the grand jury proceedings be rejected.

## C.  Remaining Ineffectiveness Claims

Howard's remaining ineffectiveness claims are that counsel failed to:

---

[26]  *See, e.g., Turrentine v. Mullin,* 390 F.3d 1181, 1189-90 (10th Cir. 2004), *cert. denied,* 545 U.S. 1106 (2005); *Brown v. Uphoff,* 381 F.3d 1219, 1225 (10th Cir. 2004), *cert. denied sub nom,* 543 U.S. 1079 (2005); *Aleman v. Sternes,* 320 F.3d 687, 690 (7th Cir.), *cert. denied,* 539 U.S. 960 (2003); *Herrera v. Lemaster,* 301 F.3d 1192, 1199 (10th Cir. 2002), *cert. denied,* 537 U.S. 1197 (2003).

adequately investigate, interview any witnesses before trial, follow up on his request for discovery, impeach prosecution witnesses at trial, and consult with Petitioner before or after the second trial. All of these assertions are entirely conclusory, and conclusory allegations are insufficient to meet either *Strickland* prong. *E.g., Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir. 1991); *Snyder v. Addison,* 89 Fed. Appx. 675, 681 (10th Cir.), *cert. denied,* 543 U.S. 858 (2004); *Bolt v. Poppell,* 36 Fed. Appx. 930, 934-35 (10th Cir. 2002).

Furthermore, having reviewed the tapes and the sufficiency of the evidence above, I find that Howard cannot establish prejudice as a matter of law. Therefore, I find the state court rejection of Petitioner's ineffectiveness claims were not "contrary to" or "unreasonable" under AEDPA standards and will recommend that his remaining claims be rejected.

Wherefore,

IT IS HEREBY RECOMMENDED AS FOLLOWS:

1. Respondents' motion to dismiss Claims 1 and 3 as procedurally-barred or as raising only state law issues *(Doc. 38)* be denied in part and granted in part;

2. Respondents' motion to dismiss Claim 2 *(Doc. 37)* be denied in part and granted in part;

3. All issues raised in the § 2254 petition *(Doc. 1)* be denied on the merits; and

4.  Any unexhausted claims also be found procedurally-defaulted.

THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 10

DAYS OF SERVICE of a copy of these Proposed Findings and Recommended

Disposition they may file written objections with the Clerk of the District Court

pursuant to 28 U.S.C. § 636(b)(1).  A party must file any objections with the

Clerk of the District Court within the ten-day period if that party wants to have

appellate review of the proposed findings and recommended disposition.  If no

objections are filed, no appellate review will be allowed.

_____

UNITED STATES MAGISTRATE JUDGE

# Appendix – Defense Counsel's Closing Argument

You know what, ladies and gentlemen?  I have been in this business for a long time.  I have yet to read the statute that says it's a crime to know something's wrong.  Never seen that.  The reason is because that's not a crime.  To suspect that something may be amiss is not a crime.  Your job in this case is to determine whether the State has proven beyond reasonable doubt, the crimes that are charged in this case.  And they boil down essentially to three – three types – fraudulent use of a credit card, forgery, conspiracy to commit those crimes.  Conspiracy is an agreement with another person to commit a specific crime.  Forgery is knowingly signing somebody else's name to a check, knowing that you don't have authority to do that.  Fraudulent use of a credit card is deliberately using somebody else's credit card knowing that you don't have their permission to do that.

The State has to prove to you through its evidence in this case, if it can do it, and I submit to you it has not, that Craig Howard in fact beyond reasonable doubt knew, not just that something might be wrong.  The State has to prove to you beyond reasonable doubt that Craig Howard in fact knew Laquita, not Laqita, her name is Laquita Demyers, was using a stolen credit card and that beyond a reasonable doubt, he knew she was using stolen checks.  That he was with her those days does not prove that.  That some of the items purchased were for him do not prove that.  God help us for going shopping with somebody else, who buys us something, if that by itself makes it a crime just because it turns out they used something they weren't supposed to to make the purchase.  Has the State proven to you beyond a reasonable doubt that in fact Craig Howard knew those things?  Because that is your job.  You must find each essential element of these crimes as Judge Martínez has defined them to you beyond a reasonable doubt.

All right now, let's look at what the evidence actually is.  Did Craig Howard lie to the police?  Yes.  Wanda's Laquita, we know that.  Mr. Clark even concedes that he is lying to protect

Laquita, that is certainly true.  And he did tell the police he knew something – knew something, but what?  Mr. Clark says, well he lied about how many times he went to the mall.  Well, but what has the evidence turned out to be?  That yes, he was with her the day they went to, um, County Seat, er, excuse me, the first day with the credit cards, when they bought the picture and the shoes.  That's lumped together in one charge.  OK.  But he also told Mr. Perea, and I went through that with him, that "yes," he was there at the mall on that day with her at Maurice's as well.  He said he didn't go in, the evidence – there is certainly evidence to support that.  And I'll talk about that a little more in a minute.  That was on a different day.  So he is not telling the police "I only went one time, that's it, period, ever."  No, by his own admission what he told Mr. Perea is that yes he was there that day at the mall at Maurices.  Mr. Clark correctly notes that Mr. Perea never asked him about anything with Penneys or County Seat.  And how does this question work?  You heard, you heard some of it.  It's not "OK, you just tell me everything you know about every possible crime that could ever have been committed, or anything Laquita and you have ever done."  No, you're asked specific questions, you answer the specific questions.  If you're not asked about April 25th, and you're not asked about County Seat, and you're not asked about JC Penneys, then you don't talk about it.  And, to not have mentioned those is not lying to Mr. Perea.  Mr. Perea chooses the questions that he wishes to ask.

Now, Craig Howard, Craig Howard answers the questions that, that Detective Perea puts to him, and that's it.  You must remember that structure in analyzing the statement.

It's – now, getting beyond that.  What else did he tell Mr. Perea over and over and over?  "I did not know she was using a stolen credit card."  "I did not know that those checks were stolen."  "I did not know that."  And that is exactly what the State has to prove beyond a reasonable doubt, that he did know.  And he repeatedly tells Mr. Perea that, and – because they argue back and forth, and as I had brought out with Mr. Perea – the way a lot the arguing between them goes is – Mr. Perea

telling him "look, you were with her, you have to be guilty."
He's saying "What – what are you talking about?"  "Just because
I'm with her I'm guilty?"  And he says "yes" and he admits that
that's what he said.  Well that's not the law.  Judge just told you
what the law is and that ain't it.

All right, now, let's go beyond that.  What in this evidence
tells you that beyond a reasonable doubt Craig Howard knew
she was using a stolen credit card, knew she was using stolen
checks?  Well, Lequita Demyers tells you "he didn't know that."
"I didn't tell him that."  Why should you believe Laquita?  She's
been in trouble before, that's true.  She got convicted of sixteen
offenses, she plead to sixteen substantive crimes in this case,
that's true.  I asked her why and she told you "why are you
here?"  "Are you here to get Craig Howard off?"  And her
answer was "no."  "I made a lot of mistakes in my life – I just
want to get that stuff behind me – trying to get my life turned
around, and I'm just here because, I'm here to tell the truth, I
know what perjury is – I don't want to get punished for that if I
get caught lying.  If I am lying, I'm just here to tell the truth.
That's the truth.  Craig Howard did not know."

Now, again, why should you believe her, she's a convicted
felon?  Because of the kind of person that she now is, and you
must take that into account now as well.  And I suppose the
State can ask you to, you know, be, be, completely cynical and
say just, look, forget her, they're friends, she's gonna come here
to lie for him, try to get him off.  So, you know, just take that
into account, just blow her off.  Except, what she's told us rings
true.  Remember when she told us how she got these things in
the first place starting from McDougal.  As Mr. Clark correctly
points out, she's down here because she got in trouble up in
Michigan and thanks – with the help of the church she and
Craig are down here trying to get her life turned around.  Fine.
Then what do we also know?  We know that Mr. Howard
works, she didn't.  We also know that she'd come into, what,
$3,000 from her income tax return, just very recently, so she did
have money.  She told us that she really does have credit cards
of her own, that she put the money in the bank.  All right, Mr.

Howard knew those things.  But she also said, you know, Craig's at work.  She's at this place where drugs are used and sold, apparently.  Craig's not there.  People come in and say "hey, we've got this stuff we've been using it, you want it, sure, take it, go."

And that – we know that's true.  We know it for two reasons.  One, because of the phone message that [the victim] got when she got home around 1:00 or 1:30, whatever she testified to.  Hey, guess what, there's a lot of activity on your credit card, real suspicious, real unusual, because you don't use your card that way.  Where was it being used?  Where does she remember being told?  Fifth Avenue?  No.  Foot Action.  No.  Radio Shack, Walgreens, [unintelligible].  Somebody else was using the credit card at those places.  And very quickly.  Because the time frame certainly is rather short here.  And there's no evidence that Craig Howard or Lequita Demyers was at Radio Shack or Walgreens or whatever other store it was, using this credit card before she ever got it.

The other thing it tells us is, is how many times, how many transactions total with the credit card.  Five or six is what [the victim told us].  OK.  What are we concerned with in this case today?  Two on the one day.  What does five or six compared to two mean?  That Lequita Demyers told you the truth about how she got the card and what she did, and you must take that into account as well.  We know that to be true.  So she knows Craig's got a car at work, so she goes and she says "let's go to the mall."  OK, they do.  And then come the transactions.

All right.  Now.  What about the transactions themselves?  Um, and before I pass on Lequita at that point.  Was she back in using cocaine?  Yes.  Every day?  No.  How much did she spend on it?  We don't know.  Mr. Clark didn't ask her.  How often specifically did she use, how many dollars a day did she spend?  We don't know.  Five dollars, ten dollars, a hundred dollars?  We don't know.  The State didn't call her to answer that.  She's on the stand, has to answer all questions.  Just in general  portray her – she's a crack addict.  Without getting

down to the specifics of dollars.  They said crack's expensive.
Well, yeah, I mean, everything used enough of, I suppose it
really is.  But you gotta know how much, how often, and what
price before being on crack or using cocaine makes any sense at
all and factors into this at all.  You must think of that ladies and
gentlemen.

Then the second thing about that is, does Craig Howard
know that?  He's down here with Lequita to get her life
straightened out.  He's at work.  Does that mean that she knows
– that he knows where she's going and what she's doing during
the day when he's at work?  My, my, uh, one way of looking at
that is why would she tell him that?  Does she want him to
know that?  She's supposed to be down here getting her life
straightened out.  Sad to say, ladies and gentlemen, it's just as
reasonable, and probably more, that she's not going to tell him
that.  And he's gonna think that she's down here to get her life
straightened out and she's got some money to spend now, rather
than you're a crack addict, let's go, um, spend your stolen
money, and I don't know how you got it, I don't want to know,
but I gotta know that it's stolen somehow.

All right.  Now let's get to the transactions at the mall.
What in the transactions themselves would indicate to Craig
Howard that the credit card is stolen or that she's using stolen
checks?  Well, there's certainly nothing in the transactions
themselves that told the clerks that.  They go to Fifth Avenue
and the County, excuse me, Fifth Avenue and then the Foot
Action and what happens?  Pick out the item, Laquita goes to
the counter, pulls out the credit card, they take the credit card,
run it, she signs it, they leave.  Nobody asked her for any
identification.  And I suppose because Craig Howard is
supposedly standing nearby, at the counter, that automatically
means that he does what none of us do.  Which is, your wife or
your friend pulls out a credit card, you lean over to see whose
name's on it.  I don't know anybody who does that.  I dare say
you don't know anybody who does that.  So, it's just your simple
'ole transaction –" here's your credit card, thank you very much,
have a nice day."  Do that twice.  What do the transactions tell

Craig Howard?  Did they give any evidence that the clerks asked her "by the way what is this name, I can't read your name," um, and she gives a name that's false.  Or that they ask her for ID and start saying out loud OK, uh [victim's name] da, da, da, da – nothing, not a single thing in any of these transactions that would tell Craig Howard, independently, that that's not Laquita Demyers using credit cards or checks that belong to Laquita Demyers.  Not one thing in any of these transactions, and you must remember that.

Then come the number of transactions.  He's involved in – and I think this is a really key point in this case.  Lequita plead to sixteen counts.  The grand total of the total transactions, if you add up what [the two victims] told us, the grand total is up around fifty – fifty to fifty-three, I think.  Um, between the number of credit cards and checks [of the victims].  Lequita admitted her guilt to sixteen.  Well, if Craig Howard is part of the scheme to go rip everybody off, cash in, then where is he for all the rest of them?  If he's part of this conspiracy knowing a stolen credit card is being used, knowing stolen checks are being used to buy this stuff, then why isn't he cashing in too?  In just the same way that Laquita Demyers is?  The very fact that he is not, ladies and gentlemen, is powerful evidence that he did not know how she is paying for these purchases.  Because that very fact flatly contradicts the view of Craig Howard the State wants you to have.  They want you to have him in this thing up to his eyeballs, cashing in, taking advantage, then how come he does so few?  How come he is present at so few?  And the answer is obvious and compelling, because he in fact does not know how she's paying for these things.

Ladies and gentlemen, what it comes down to.  When Mr. Clark just says "just look at the whole picture, you can go transaction by transaction."  Well, yes, go transaction by transaction.  Think about how County, uh – think about how the credit card was used and how easily that was done.  Same thing with the shoes, how easily that was done.  Think about, yes, think about  [a store employee] and what she told you.  And then what she told the police that afternoon within an

hour or two.  Nothing about a man with a droopy eye, two black men, not one.  [Another store employee] sees two black men, sitting or standing by a bench outside as Laquita's writing a check.  Yeah, you gotta think about it transaction by transaction, and what those transactions tell you about what Craig Howard actually did and what he should have known from the nature of the transactions.

And then think about JC Penney's.  There's no evidence that Craig foot – that Craig Howard set foot in JC Penney's.  There isn't even single clerk from JC Penney's who say, "yes, I remember that guy with the droopy eye, when that black lady bought the comforters."  There's not any evidence that he set foot in that place.  That day or any other.  Period.  Yet the State says he must know about that one too, and he must know, since he's carrying the bag, that that must mean that he knew that Laquita Demyers was using a stolen check to make that purchase without proof that he was even present when she made the purchase.  So, yeah, go transaction by transaction.  Because the law tells you – actually  Judge Martínez told you to do that.  Each crime charged in the indictment is separate.  And so you have to go transaction by transaction.

But you still come back to the essential thing in this case, ladies and gentlemen, and that is has the State proven beyond a reasonable doubt that he, in fact, beyond reasonable doubt, knew she was using stolen credit card on April 1st, that she was using stolen checks on April 3rd, and April 25th?  Not whether he thought something might be wrong.  Has the State proven that?  He told Mr. Perea over and over and over "I did not know that."  Lequita Demyers tells you he did not know that.  The State has not proven to you that either one of those people are lying.

And I'm not asking you to say that Craig Howard, because of their relationship, might not have inquired further.  Maybe there were questions that he should have asked and didn't.  It's not a crime to not ask the questions and look back in hindsight and say, "ah, jees, I should have asked her."  There's no proof

that he did and no proof that he knew what exactly she was doing and exactly how she was paying because, remember, what he does know about her.  She has had credit cards in the past, she has worked and made money in the past, she has $3,000 at least, at her disposal, right now, as far as he knows.  He didn't ask.  Maybe some – maybe he suspected something's up, so what?  That's not the crime.  You can't convict Craig Howard because he should have been more, uh, should have asked the questions of Laquita that he didn't ask.  That's not the crime.  It was not a crime to be with Laquita and it was not a crime for her to have bought – for him to have received from her some things that she bought for him.  Those are not crimes.  They do not prove crimes.  It is your duty to apply the law to the facts as the judge gave it to you, and for you to find out what those facts are.  And these facts simply don't come close to establishing beyond a reasonable doubt that he knew the credit card was stolen, that he knew that the checks were stolen.

Please do not give into the temptation that the State has put in front of you.  Which is, he had to know something, if he was hanging around with Laquita, so that's enough to convict a man of these kind of felonies.  They say just let that – that when he tells the police he knew – taking all of those words together – he knew something was up, something might be wrong her, that that's the crime.  That that's proof beyond a reasonable doubt of the specific crimes with which he's been charged.  It is not.  Do your duty, ladies and gentlemen, as I'm sure you will.  That's why you're here.  That's why we picked you.  Because we are confident that that's exactly what you are going to do.  I'm not asking you to give Craig Howard merit badges.  I'm asking you to say the State did not do its job in this case, which is to prove beyond reasonable doubt that he committed the crimes for which he is charged in this court.  Mr. Howard and I are confident that you will do exactly that, that you will find him not guilty of these crimes.  Thank you, ladies and gentlemen.

*From Tape 8* (August 1999 trial).